Sidney and Julia CLARK, et al., Plaintiffs-Appellants and Cross-Appellees,

v.

UNIVERSAL BUILDERS, INC., et al., Defendants-Appellees and Cross-Appellants.

Nos. 82–1770, 82–1859.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 10, 1982.

Decided April 19, 1983.

Carol R. Thigpen, Jenner & Block, Chicago, Ill., for plaintiffs-appellants and cross-appellees.

John F. McClure, Michael Turoff, Arnstein, Gluck & Lehr, Chicago, Ill., for defendants-appellees and cross-appellants.

Before CUDAHY and COFFEY, Circuit Judges, and SWYGERT, Senior Circuit Judge.

CUDAHY, Circuit Judge.

· This appeal arises from a class action suit, originally filed in January of 1969, which alleged that defendants had violated plaintiffs' rights under section 1982 of the Civil Rights Act of 1866, 42 U.S.C. § 1982 (1976). After a bench trial in the United States District Court for the Northern District of Illinois, District Judge Nicholas J. Bua concluded that the plaintiffs had failed to es-tablish a violation of 42 U.S.C. § 1982 and entered judgment in favor of the defendants on May 4, 1982. We affirm the judgment of the district court.

## I

· The plaintiffs in this case are a class of over 1,000 black home buyers who purchased newly constructed single family dwellings from defendants under land installment contracts during a period from 1957 to 1969. All of these dwellings are located on the south side of Chicago and each plaintiff has made at least one payment under his contract.

The defendants include the building contractor for the homes, Universal Builders, Inc. ("Universal"), the "land companies" through which the homes were sold, the realty company which was the exclusive sales agent for the homes and various individuals who were affiliated with these companies. After incorporating in 1956, Universal entered into a series of joint venture agreements with corporations that agreed to purchase the land on which Universal was to build the homes and to finance the construction of the homes by obtaining long-term mortgage loans. These "land companies" determined which lots would be purchased and the joint venturers decided what models would be offered for sale on each lot.

The district court found that between early 1957 and early 1969 approximately 1350 residences were constructed by Universal and sold by the land companies. The district court also found that eighteen of these homes were sold to buyers who obtained mortgages, while the remainder were sold through installment contracts. Defendants advertised the homes through black-oriented newspapers and radio stations. Approximately twenty-five sales were made to whites, although some of these sales involved racially-mixed couples, and the remainder were to black purchasers. The homes were all located in a middle-class neighborhood located approximately seventy-five blocks south of downtown Chicago.

Plaintiffs have had, through the course of this litigation, two alternative theories of liability. Under a "traditional" theory, plaintiffs claim that defendants violated their civil rights by selling homes to black buyers at higher prices and on less favorable terms than were available to similarly situated white buyers. Plaintiffs have also argued an "exploitation" theory of discrimination. Under this theory, plaintiffs have attempted to prove that as a result of racially-based residential segregation a "dual" housing market existed in Chicago which defendants exploited by demanding prices and terms of black buyers which were unreasonably in excess of the prices and terms available to white buyers of comparable housing.

In 1969, District Judge Hubert Will denied defendants' motion to dismiss plaintiffs' complaint, and sustained plaintiffs' exploitation theory as stating a claim for relief under 42 U.S.C. § 1982. *Contract Buyers League v. F & F Investment,* 300 F.Supp. 210 (N.D.Ill.1969), *aff'd on other grounds,* 420 F.2d 1191 (7th Cir.), *cert. denied sub nom., Universal Builders, Inc. v. Clark,* 400 U.S. 821, 91 S.Ct. 42, 27 L.Ed.2d 49 (1970). The case was then tried to a jury in 1972. At the close of the plaintiffs' case in chief, District Judge Joseph Sam Perry granted defendants' motion for a directed verdict, ruling that without evidence of discrimination under the traditional theory, plaintiffs could not prove liability under section 1982. *Clark v. Universal Builders, Inc.,* 501 F.2d 324, 328 (7th Cir.), *cert. denied,* 419 U.S. 1070, 95 S.Ct. 657, 42 L.Ed.2d 666 (1974). Plaintiffs appealed and this court reversed and remanded, holding that, when all the evidence was viewed in the light most favorable to the plaintiffs, "the admitted evidence was sufficient to establish a *prima facie* case under section 1982 pursuant to the exploitation theory of liability and ... under the so-called traditional theory of discrimination ...," and accordingly warranted submission of the issues to the jury. 501 F.2d at 334.

In June 1979, after numerous postponements in the trial on remand, plaintiffs moved for a preliminary injunction, charging that the defendants were systematically depleting the assets of the corporate defendants. In October 1979, District Judge Nicholas J. Bua denied the motion, finding that the plaintiffs had failed to demonstrate irreparable harm.

In November 1979, after the parties waived trial by a jury, a second trial, lasting sixteen days, was held before Judge Bua. In May 1982, the district court entered judgment for the defendants, finding that the plaintiffs had failed to meet their burden of proof under either theory of potential liability. This appeal followed.

## II

■ As a preliminary matter, we note that our scope of review in this case is somewhat limited. The district court's findings of fact cannot be set aside on appeal unless they are "clearly erroneous." Fed.R.Civ.P. 52(a); *Pullman-Standard v. Swint,* 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982). "The question for the appellate court under Rule 52(a) is not whether it would have made the findings the trial court did, but whether 'on the entire evidence [it] is left with the definite and firm conviction that a mistake has been committed.'" *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129 (1969) (citing *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948)). While our discretion within the "clearly erroneous" standard is slightly broader in this case because the district court partially relied on documentary evidence or found many facts by drawing inferences from undisputed facts, *Oscar Gruss & Son v. First State Bank of Eldorado,* 582 F.2d 424, 430–31 (7th Cir.1978); *Flowers v. Crouch-Walker Corp.,* 552 F.2d 1277, 1284 (7th Cir.1977), we are still constrained to give substantial deference to the findings of the district court. This is especially true where the district court made determinations as to the credibility of witnesses. *Apolskis v. Concord Life Insurance Co.,* 445 F.2d 31, 34 n. 1 (7th Cir.1971).

The law governing this case was set forth by this court's 1974 opinion which explained the elements of a *prima facie* case of liability under both the "traditional" and the "exploitation" tests of discrimination. *Clark v. Universal Builders, Inc.,* 501 F.2d 324 (7th Cir.), *cert. denied,* 419 U.S. 1970, 95 S.Ct. 657, 42 L.Ed.2d 666 (1974). To establish liability under the traditional test, plaintiffs must make

a showing of "treating, in similar circumstances, a member or members of one race different from the manner in which members of another race are treated." That is, a black prospective buyer of a dwelling demonstrates discriminatory conduct if he proves that an owner utilizes different pricing policies with respect to blacks and whites similarly situated.

501 F.2d at 336 (citation omitted). To establish liability under the exploitation test, plaintiffs must show that

as a result of racial residential segregation dual housing markets exist and ... defendant sellers took advantage of this situation by demanding prices and terms unreasonably in excess of prices and terms available to white citizens for comparable housing.

501 F.2d at 334. The court further stated that "the benchmark for guiding a seller's conduct in the black market is reasonableness." 501 F.2d at 333. The district court in the case before us found that the plaintiffs had failed to establish a *prima facie* case under either theory, and thus did not reach the question whether the defendants could "articulate some legitimate, nondiscriminatory reason" for their conduct. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). Holding these standards in mind, we turn to consider the district court's finding under each theory.

1. Because of our acceptance of the district court's finding as to lack of comparability, we need not reach defendants' contention that the Deerfield homes were sold by a company which was not a predecessor of the defendant Universal.

2. Plaintiffs attempted to bolster their argument about the physical comparability of the homes

### A.) The Traditional Theory

To prove their case under the traditional theory, plaintiffs attempted to show that the defendants had sold homes in the suburban town of Deerfield, Illinois to white home buyers on different terms than they were using to sell "comparable" homes to black buyers on the south side of Chicago. The most critical hurdle faced by the plaintiffs was showing that the homes they sought to compare, the ones in Deerfield and the ones in Chicago, were, in fact, comparable. The district court found that the homes in question were not comparable, and this finding is not clearly erroneous.

The allegedly comparable groups of homes were located in communities which were of very different character. The Deerfield homes were sold between 1953 and 1958.[1] The district court found that at that time, Deerfield was a relatively sparsely settled suburb, with a "somewhat rural character." The Chicago homes were sold between 1958 and 1969. The neighborhood in which these homes were located was mature and urban in character, and it underwent a substantial degree of racial turnover during the period in question.

The physical characteristics of the homes in question were also quite different. The houses built in Deerfield were ranch houses, of frame construction, and typically built without basements. In contrast, the south side homes were multi-level homes, generally brick, and typically with basements. While many different models were offered both in Deerfield and on the south side, there is little evidence to suggest that the district court's finding that the two sets of homes were not physically comparable is clearly erroneous.[2]

by pointing out that defendants had utilized a picture of a Deerfield home in a brochure promoting the homes defendant was selling in the south side location. There is substantial dispute about both the significance and the purpose of displaying the Deerfield home in the brochure. The district court made no finding as to this matter. Taking this evidence in the light most favorable to the plaintiffs, we do not

Plaintiffs placed great emphasis, both at trial and on appeal, on the evidence presented as to the "direct cost," respectively, of the Deerfield and south side homes. The plaintiffs presented testimony from a certified public accountant with expertise in the housing industry to the effect that the direct construction costs of the Deerfield and south side homes were the same.[3] Plaintiffs assert that this direct cost evidence is highly probative as to comparability both because direct cost is an objective measure of the dollar value of a home and because the land cost which is included in direct cost reflects differences attributable to physical location and community amenities.

The district court found this evidence unpersuasive, partly on the basis of testimony from the plaintiffs' own architectural expert. This witness testified that homes with the same direct cost of construction were not necessarily comparable from the point of view of value to the purchaser. This witness also testified that sales prices were not necessarily closely related to construction costs. The district court concluded that direct construction costs were not conclusively probative of the economic comparability of the two groups of homes.

■ We find that the conclusion of the district court is not clearly erroneous. The direct costs of a home are indeed a limited indicator of comparability. *See Clark,* 501 F.2d at 337–39. But a number of factors must be considered in the process of determining whether ostensibly dissimilar items may be considered comparable for purposes of a suit such as this one. Apparently what plaintiffs are arguing is that otherwise dissimilar houses selling in different markets should, absent discrimination, sell for the same price (or have the same "value") when they have the same or similar direct costs. It is true that price (and "value")

tends to be driven toward cost through the process of sale in a competitive market. But there are presumably factors other than discrimination which affect the supply-demand balance and which influence the selling price of homes. These other factors tend to be minimized when identical items are sold in the same geographic market to purchasers who are similar in all respects but that of race. Here, of course, the equivalency only in cost leaves considerable room for other variables to affect selling price (or "value"). The district court considered the evidence as a whole and concluded that there was "a complete dissimilarity between the Deerfield and south side homes in terms of community environment, lot size, building materials, design, and layout." In the face of such a finding, even taking the evidence of similarity of cost in the light most favorable to plaintiffs, we must defer to the conclusion of the district court that the homes in question were not comparable.

■ The district court further found that not only had there been no showing of comparability but that there had also been no showing that defendants utilized discriminatory pricing policies. We hold that the district court's findings as to the absence of discriminatory pricing policies is not clearly erroneous.

The plaintiffs base their claim of discriminatory pricing on two different types of evidence. First, plaintiffs claim that the gross profit obtained in south side sales substantially exceeded the "standard" gross profit of the housing industry. Plaintiffs also sought to demonstrate that defendants' gross profit on south side housing sales was substantially greater than the gross profit they achieved on sales in Deerfield. In addition, plaintiffs attempted to show, using appraisal evidence, that defendants'

think that it is significant enough to overcome the weight of the evidence going against a finding of comparability.

3. There is apparently some variation as to the precise elements which various builders include in or exclude from "direct costs," but, generally speaking, the term appears always to include

land costs, materials, and labor costs directly associated with a particular building, while excluding the overhead and generalized (or indirect) expenses of the builder. Practice apparently varies with respect to the inclusion in direct costs of sales expense.

prices for south side homes, as compared with Deerfield homes, substantially exceeded fair market value.

A key element of plaintiffs' gross profit argument is their assertion that a "standard" gross profit[4] existed in the housing industry. Plaintiffs presented several expert witnesses who testified that there was a standard gross profit in the home building industry of fifteen to twenty percent of the sales price. The average gross profit defendants derived from their south side sales was slightly over twenty-seven percent while the average gross profit for Deerfield homes in 1957 was approximately seventeen percent. On the basis of this, plaintiffs maintained that defendants' achievement of higher than "standard" profits on south side sales was highly probative evidence of racially biased pricing practices.

The district court found that the plaintiff did not prove the existence of a standard gross profit ratio in the housing industry by a preponderance of credible evidence. Witnesses from both sides testified as to the matter, and the district court explicitly found the evidence refuting the existence of such a standard to be more credible. We find no basis to overturn the district court's finding as to credibility. The record shows substantial conflict as to whether such a standard existed, and the district court was clearly in the best position to evaluate conflicts in credibility of witnesses. We may also assume that, to the extent a "standard" existed, it only represented an average with deviations reflecting market conditions and other factors.

Plaintiffs further assert that regardless whether a "standard" gross profit existed, the spread between defendants' gross profit in Deerfield and on the south side indicated discriminatory pricing. The district court found that there were a wide variety of factors which determine what profit a builder will earn, and hence determined that the disparity in gross profit did not necessarily indicate discriminatory pricing. Again, we do not think that this finding was clearly erroneous. There are a wide variety of factors which may explain the disparity in gross profit ratios between these two communities. There is some indication in the record that the Deerfield sales being compared were the last of what had been a relatively unsuccessful venture of the builder. The defendants assert that those homes were "closed-out" at relatively depressed prices, and the plaintiffs did not contradict this. There is also substantial dispute among the parties as to the proper method of calculating "gross profit." Variations in accounting methodology, and in treatment of indirect costs such as sales expenses, may explain some of the seemingly significant disparity.[5] In any event, a simple showing of differences in spreads between prices and direct costs, with the possibility of several variables being responsible for the spread, seems in itself to be considerably less than conclusive proof of discrimination.

Plaintiffs also offered appraisal reports as evidence of the fair market value of the homes built in Deerfield and on the south side in an effort to show that the average sales price approximated the appraised value for the Deerfield homes but greatly exceeded appraised value for the south side homes. Those appraisals were made by savings and loan associations that were required by Illinois and federal law to prepare written appraisals of the value of any real estate given as security for a mortgage loan. The district court did not find this evidence probative of discrimination, both on the basis that appraisals were only subjective estimates of property value subject

---

4. The district court defined "gross profit," as used in the case, to be the difference between sales price and direct cost.

5. In addition, we note that a consistent disparity in "profit" at one location in comparison with another may either suggest market power in the seller at one place not matched at the other or the disparity may suggest differences in risk or in efficiency. (There are presumably other factors which might also affect the respective margins of profit.) If there is market power in the south side location, it would seem to imply a difference in competitive conditions which we would have expected the parties to explore in greater detail.

to substantial variance and on the grounds that appraisals did not necessarily reflect fair market value.

Testimony was presented by both sides as to the reliability of this appraisal evidence. Witnesses from the savings and loan associations which commissioned the appraisals testified for the plaintiffs, while defendants presented the testimony of an expert witness who had examined some of the appraisal reports. The district court found the testimony of defendants' expert to be more probative as to the objective validity of appraisals. This expert testified that the savings and loan associations which commissioned appraisals tended to influence an appraiser to make a liberal or conservative estimate of value depending on whether the savings and loan desired to make the loan. While we would not uniformly reject the use of appraisal evidence in all cases of this sort, we cannot say that the district court's decision to rely on defendants' critique of the appraisal evidence in this case was clearly erroneous. The objectivity of the appraisals in question here may well have been influenced by commercial considerations. The district court carefully considered the reliability of these reports, and we do not disagree with its decision to discredit them.

Witnesses from both sides also testified as to the relationship between appraisal value and "fair market value." Several of these witnesses, including witnesses presented by the defendants, agreed that appraisals were prepared for reasons other than simply establishing the fair market value of a home. Two of the plaintiffs' witnesses, appraisers from savings and loan associations, stated that the appraisals which they prepared were used for the purpose of determining the allowable size of a bank loan for a particular property. The district court found that this cast sufficient doubt on the relationship between an appraisal and fair market value to prevent the plaintiffs from relying on this evidence as proof of discrimination. We agree with this conclusion, and further note that the evidence of disparity between appraisal and fair market value, even if we were to credit

plaintiffs' appraisal evidence, is not wholly convincing. Defendants presented evidence indicating that there was a substantial range of variance between appraisal value and sales price of the homes. Defendants also presented evidence, through the cross-examination of plaintiffs' expert accountant, that if the homes had been sold at appraised value, defendants would have suffered a loss. If this were the case, we would have some difficulty in according determinative weight to this appraisal evidence. Thus, we cannot reject the district court's determinations on this issue.

Further, we must approve the district court's conclusion that any differences in terms of sales for Deerfield and south side homes were not sufficient evidence of discriminatory behavior by the defendants. Plaintiffs asserted that the defendants' preference for installment contracts, as opposed to mortgage sales, was evidence of defendants' intent to impose more onerous terms of sale on black than on white purchasers. The district court found, however, that defendants utilized installment contracts in their Deerfield operations also. The district court further found that there was evidence to indicate both that the purchasers who did purchase with installment contracts were not disadvantaged by such a form of transaction and that there was evidence to support defendants' contention that installment contracts were the only means by which some of the purchasers could qualify to purchase homes. While we again recognize the conflicting testimony which was presented to the district court on this matter, we find that the district court's assessment of the evidence presented was not clearly erroneous.

B.) The Exploitation Theory

In order to establish liability under the exploitation theory, plaintiffs sought to prove 1) that during the relevant time period a "dual housing market" existed as a result of residential segregation and 2) that defendants unlawfully took advantage of this situation by demanding unreasonable prices and terms of sale from plaintiffs.

The key element to be proved in this branch of the plaintiffs' case was the existence of a dual housing market. The district court took judicial notice of "the fact that during all time periods relevant to this case Chicago residential patterns have been characterized by a high degree of racial segregation," but found that the plaintiffs did not meet "their burden of showing that the patterns of residential segregation existing in Chicago and contributed to, in significant degree, by race discrimination, presented the defendant with the opportunity to charge exorbitant prices."

Extensive evidence was presented concerning the dual market phenomenon. Several sociologists and demographic experts testified as to the widespread racial segregation which was responsible for the exclusion of black home buyers from white neighborhoods. It was shown that disparities in ability to afford housing were not sufficient to explain existing patterns of residential segregation. Several of the plaintiffs also testified as to their personal encounters with racially-motivated housing discrimination. In sum, the plaintiffs succeeded in painting a deplorable picture of the discrimination reflected in Chicago housing patterns during the period in question.

The plaintiffs also presented credible evidence of substantial population growth in the Chicago area, generating a strong demand for additional housing. In addition to generalized population growth, the number of black households in Chicago grew significantly in relation to the number of white households. During the period from 1950 to 1970, the number of black households in the City of Chicago grew by 188,000, while the number of white households declined by 150,000. Plaintiffs contend that these statistics supported an inference that there were more black households competing for the supply of new single family homes available to them than white households. Plaintiffs also presented evidence of a "pent-up" demand for single family homes due to the historical pattern of racial discrimination in the Chicago housing market.

■ The core problem with plaintiffs' evidence is that it does not prove enough. The district court credited much of the evidence presented by plaintiffs, but found that the evidence was not sufficient to explain how these market conditions could have presented the defendants with the opportunity to exploit the market by charging plaintiffs unreasonably high prices. In other words, the district court accepted plaintiffs' contention that Chicago suffered from a high degree of racial residential discrimination and that there was a substantial demand for housing among black households, but did not accept plaintiffs' further contention that this phenomenon enabled defendants to exploit the plaintiffs. We find that this conclusion is not clearly erroneous.

Plaintiffs presented no plausible explanation of how defendants could have charged unreasonable prices in the face of a market for housing which showed no indicia of being monopolized or uncompetitive. In other words, there is no adequate explanation of how the defendants could have obtained the market power to do what they are accused of doing. Even if we fully accept the proposition that blacks were completely restricted to the particular geographical housing market in which defendants were operating, there has been no evidence presented which shows how defendants could have in fact charged higher prices or demanded more restrictive terms than their competitors in that particular location.[6] Conflicting testimony was presented concerning defendants' precise market share, but plaintiffs do not claim that defendants had a sufficient market share to shelter them from the pressures of competition.

Not only did plaintiffs fail to adduce evidence of a market share suggesting market

---

**6.** We assume, for purposes of this argument, that this "market" is defined in its narrowest or most limited sense; that is, new single family housing in the community areas where defendants were operating. We note that there is substantial doubt whether such a limited definition is appropriate, but we need not decide that question in this case.

dominance on the part of defendants, but they also failed to rebut defendants' evidence that the rental and "used" home markets provided additional constraints on defendants' freedom to price. Plaintiffs presented impressive evidence concerning the build-up in housing demand among black households but were not able to translate these generalized statistics into proof that defendants were operating in a market environment where they could maintain prices above levels dictated by competition. While we agree with plaintiffs' general contention that the Chicago housing market was significantly affected by racial discrimination, we cannot agree that the plaintiffs have met their burden of proving that these market conditions were such that defendants could have exploited them to their advantage.[7] There is no doubt that over the course of this lengthy litigation, plaintiffs have succeeded in demonstrating that defendants were motivated in their business behavior by considerations of profit only and were largely unmoved by any altruistic interest in racial equality. Nevertheless, we think that the plaintiffs did not succeed in proving the existence of a capability on the part of the defendants to exploit the plaintiffs through noncompetitive pricing and we therefore approve the district courts' findings with respect to this aspect of the case.[8]

7. This is not to say that plaintiffs could only have met their burden by proving that defendants were selling at prices in excess of the prices of their direct competitors in the market in question. It is also possible to imagine a situation where several builders or sales agents in a market jointly exploit the market's peculiar opportunities for profit, and thus set prices which are consistent within that market but in excess of prices in comparable markets. This was not the scenario suggested by plaintiffs, however.

8. The problem the district court had with the kind of evidence introduced by the plaintiffs illustrates the difficulties of trying a case under the exploitation theory in the absence of economic evidence shedding light on market conditions. The exploitation theory developed by this court in *Clark* operates as a direct constraint upon commercial activity in certain markets (that is, business in "dual" markets is required to be at "reasonable" prices in order

### III

Plaintiffs also attempted to demonstrate that defendants' activities were conducted in violation of 42 U.S.C. § 1985(3). In *Griffin v. Breckenridge,* 403 U.S. 88, 102–03, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971), the Supreme Court held that in order to establish a violation of section 1985(3), plaintiffs must prove that the defendants conspired, that the object of this conspiracy was the deprivation of a class of persons of the equal protection of the law or of equal privileges and immunities under the law, and that an act in furtherance of the object of the conspiracy occurred causing injury or deprivation. The district court found that the plaintiffs had "failed to establish by a preponderance of the credible evidence that defendants' activities evidenced a conspiracy to deprive plaintiffs, black citizens, of their right to equal protection under the law or their rights to equal privileges and immunities under the law." We approve this determination by the district court. The evidence in the case showed that defendants built new homes and sold them in arm's-length transactions to defendants. The district court found no credible evidence of a conspiracy involving these activities to deprive the defendants of their civil rights, and we do not find this conclusion to be clearly erroneous.

to avoid exploitation, *see Clark*, 501 F.2d at 333). But this theory of liability does not eliminate questions about *how* a business can set its prices above a reasonable level. In the absence of collusion, or a situation of a business having sufficient market power of its own, it is difficult to understand how a business could retain its market share against non-exploiting competitors. Plaintiffs must contend either that the defendants' prices alone are unreasonable, or that the price level of the market as a whole is unreasonable. Under the first theory, the plaintiffs here have not shown how defendants' allegedly unreasonable prices could have been maintained against the presumably reasonable prices of the competition. The second theory is perhaps implicitly suggested by the notion of "dual" markets. Here, however, the plaintiffs neither tried their case on this basis nor produced evidence under any theory which would tend to prove that the general price level of the south side housing market was unreasonable.

In view of our approval of the district court's finding that plaintiffs had failed to prove that defendants had violated their civil rights, we need not consider whether discriminatory intent is a requisite element of proof under section 1982. We also need not consider whether defendants are liable in their personal as well as their corporate capacities, or whether defendants are liable for punitive damages.

## IV

 Defendants cross-appeal from the district court's denial of their motion for attorneys' fees. The district court could award defendants attorneys' fees only if it found that the plaintiffs' action was "frivolous, unreasonable or without foundation, even though not brought in subjective bad faith." *Christiansburg Garment Co. v. EEOC,* 434 U.S. 412, 421, 98 S.Ct. 694, 700, 54 L.Ed.2d 648 (1978). *Reichenberger v. Pritchard,* 660 F.2d 280, 288 (7th Cir.1981). This court must affirm the district court's order unless the district court abused its discretion. 660 F.2d at 288.

The district court's order on this matter was clearly correct. Judge Bua explicitly stated that this was a close case. The plaintiffs' claims were quite clearly neither frivolous, unreasonable nor without foundation. Therefore, we affirm the district court's order denying attorneys' fees to defendants.

## V

In accordance with the views expressed above, the judgment of the district court is therefore AFFIRMED.