Joe L. SCHNEIDER, Plaintiff,

v.

Alfred BAHLER, individually and in his capacity as Elder of The Apostolic Christian Church, Edwin Bahler, individually and in his capacity as Deacon of The Apostolic Christian Church, The Apostolic Christian Church of Remington, Inc., Albert Schini and Amelia Schini, Defendants.

No. L 83–10.

United States District Court,
N.D. Indiana,
Hammond Division.

June 2, 1983.

Gary L. Watson, Lebanon, Ind., Jerome Withered, Lafayette, Ind., for plaintiff.

Thomas G. Fisher, Rensselaer, Ind., for defendants.

## MEMORANDUM AND ORDER

SHARP, Chief Judge.

### I.

The original complaint for damages was filed by the plaintiff in this case on the 24th day of January, 1983, which complaint was in a single count and contained 31 rhetorical paragraphs. The sole jurisdictional allegation in said complaint was alleged to be 28 U.S.C. § 1331. The JS–44 civil cover sheet prepared by counsel for the plaintiff alleged that the cause of action was under 42 U.S.C. § 1982.

Proceedings were held in open court with counsel for both the plaintiff and defendants present on the 6th day of May, 1983 in Lafayette, Indiana. In that proceeding it was agreed upon and ordered that the brief on jurisdictional issues as well as upon the legal issues raised under 42 U.S.C. § 1982 and 42 U.S.C. § 1985(3) would be filed simultaneously by the 31st day of May, 1983. Such has been filed by both parties. Also, in that proceeding the plaintiff was granted leave to file an amended complaint, which amended complaint was filed on May 20, 1983. The amended complaint alleges that this court has jurisdiction under Title 28 U.S.C. § 1331 and 42 U.S.C. § 1982 and Section 1985(3). The amended complaint is in a single count and contains 37 rhetorical paragraphs.

At the outset it is clear that all parties to this case are residents of and citizens of the State of Indiana and therefore there is no possible basis for jurisdiction under Title 28 U.S.C. § 1332.

The defendant filed a motion to dismiss on March 1, 1983, which was discussed by counsel in the proceedings of May 6, 1983, and the briefs which have been filed are treating the aforesaid motion to dismiss as being addressed to the amended complaint for damages. The court will likewise treat said motion to dismiss as challenging the amended complaint for damages.

The amended complaint alleges that the plaintiff is a former member of the defendant, The Apostolic Christian Church of

Remington, Inc., and that defendant, Alfred Bahler, is an influential member and Elder of the aforesaid church and that the defendant, Edwin Bahler, is an influential member and Deacon of the aforesaid church.

It is further alleged that The Apostolic Christian Church is a "closely connected church organization" which serves as the predominant influence in the lives of its members and that the elders and deacons of such church are "extremely powerful and influential persons" and that the membership of the church faithfully abides by the decisions of the elders and deacons. Under the organizational structure and teachings of the church disputes are routinely handled through the workings of the church with the elders and deacons serving as "arbiters or judges" of disputes between church members. It is alleged that there are considerable pressures exerted to persuade church members to accept the decisions of the elders and deacons.

It is alleged that defendant, Albert Schini, is a member of this church and that upon the death of the plaintiff's father Albert Schini farmed certain lands which was titled in the name of the plaintiff's mother, the plaintiff's sister, and the plaintiff as tenants in common, which farming operation by Albert Schini continued from approximately 1960 to 1974. In the fall of 1974 the defendant Schini decided to sell his farm equipment and let the plaintiff "have the ground". The ground consisted of land owned by the plaintiff's mother, sister and the plaintiff as tenants in common, plus 80 acres owned by the defendant Schini and another 160 acres known as the Scharlach farm. In reliance upon these statements by the defendant Schini the plaintiff incurred substantial financial obligations, apparently to prepare himself to assume the farming obligations on the aforesaid land. In early 1975 the defendant Schini failed to rent certain lands of the plaintiff and instead only allowed the plaintiff to custom farm his ground. In June 1976 the defendant Schini told the plaintiff that he, Schini, would not farm much longer but that the defendants felt no obligation to make land available to the plaintiff nor had they felt an obligation to leave the plaintiff's land in the past because of the defendants had always been told that the plaintiff did not want to farm. The interplay between the parties and the church can best be captured by setting forth verbatim certain rhetorical paragraphs of the amended complaint:

16. That on or about April, 1982, the plaintiff learned that the statements made by the defendant Schini and his subsequent failure to rent ground to the plaintiff had its basis in the fact that Edwin Bahler had told the defendant Schini not to relinquish control of certain farm land owned by plaintiff's mother, sister, and the plaintiff to plaintiff because plaintiff did not wish to farm. Defendant Bahler made statements knowing them to be contrary to fact.

17. That Defendant Edwin Bahler knew that due to his position as a Deacon in the Apostolic Christian Church the defendants Albert and Amelia Schini, as devout members of the Apostolic Christian Church, would accept his word as fact and would therefore be inclined not to make the land available to plaintiff.

18. Defendant Schini eventually rented his land to two (2) other members of the Apostolic Christian Church.

19. The defendant Schini, in an effort to protect his standing in the community, after having dealt with the plaintiff in such manner, and in an effort to defame and damage the reputation of the plaintiff made certain statements which formed the basis of a prior cause of action for slander by the plaintiff.

20. In an effort to settle this dispute over Schini's slanderous statements, defendant Alfred Bahler, in his capacity as an Elder of the Apostolic Christian Church, agreed to talk with the defendant Schini and attempt to resolve the problem.

21. On or about June 19, 1977, in an effort to resolve the problem without seeking legal redress, and in a manner consistent with the moral dictates of the Apostolic Christian Church, the plaintiff had another conversation with Alfred Bahler in which Bahler stated that he would talk with de-

fendant Schini and advise him, thereby exerting his considerable influence as an Elder of the Apostolic Christian Church, to contact all members of the community and retract any slanderous remarks that had been made, to make a formal apology to the plaintiff, and to rent certain ground to plaintiff. Bahler also stated he would advise the two individuals to whom the defendant Schini had rented his ground to relinquish control of said ground.

22. Plaintiff, as a member of the Apostolic Christian Church, was persuaded to believe that Schini would follow the suggestion of the church Elder, defendant Alfred Bahler. When the defendant failed to correct the situation, the plaintiff filed an action in court on or about July 11, 1978.

23. On or about December, 1978, the defendant Schini requested a meeting between all interested parties, including defendant Schini, his wife, the plaintiff, his wife and defendants' Alfred Bahler and Edwin Bahler. At that meeting both Edwin Bahler and Alfred Bahler made the statement that Albert Schini had an obligation to rent certain ground to the plaintiff and to retract all previous defamatory statements made by them about the plaintiff. Said statements were made in their capacity as influential members and Elder and Deacon of the Apostolic Christian Church.

24. Relying upon assurances of defendants Alfred Bahler and Edwin Bahler that the conflict could be resolved through the Apostolic Christian Church and in a gesture of conciliation, the plaintiff agreed to and subsequently did dismiss his pending cause of action against the defendant Schini.

25. In 1979 and 1980, the defendants Alfred Bahler and Edwin Bahler failed to resolve the conflict but continued to assure plaintiff that the dispute would be fairly and amicably resolved through the Church.

26. That in April of 1982, the defendants Albert Schini, Amelia Schini, and Edwin Bahler had a meeting with the plaintiff's previous counsel without knowledge or consent of the plaintiff. As a result of this meeting, plaintiff's prior counsel refused to pursue the plaintiff's cause.

27. On or about February, 1982, the defendant, Alfred Bahler made certain statements to a member of the community that the plaintiff was simply dragging the matter out because the plaintiff was in financial trouble and implying the plaintiff was a spendthrift.

28. That on several occasions, including July, 1982 and April, 1982, the defendant Amelia Schini stated to members of the community, including Edwin Bahler, that plaintiff had a propensity to violence, that the defendants Albert and Amelia Schini feared for their lives and property, and therefore had not remedied the situation with the plaintiff.

29. That as a result of the statements and the continuing and concerned actions of defendants, the plaintiff's reputation in the community was damaged and he has experienced considerable pain and is suffering various physical ailments and mental distress.

30. Plaintiff was strongly influenced by the teachings and precepts of the Apostolic Christian Church and elected to forego certain rights with respect to the farm ground on the understanding that the Church Elders and Deacons would settle the dispute fairly and amicably within the Church structure.

31. That Albert and Amelia Schini did, in concert with Edwin Bahler, both individually and in his capacity as an official of the Apostolic Christian Church, and Alfred Bahler, both individually and in his capacity as an official of the Apostolic Christian Church, conspired to and did wrongfully maintain possession of land which would have been available to the plaintiff. Said conspiracy was based, *inter alia,* on the representation to plaintiff, which plaintiff was influenced to accept as a member of the Apostolic Christian Church, that the Church would insure the fair and equitable settlement of the dispute.

32. That the defendants Albert and Amelia Schini wrongfully maintained control over land which would have been available to the plaintiff based upon a false and misleading statement made by Edwin Bah-

ler that plaintiff did not wish to farm. Further, the defendant Bahler made these statements knowing them to be false. Further, the defendant Bahler knew or should have known that since he was a Deacon in the Apostolic Christian Church, the defendants Albert and Amelia Schini, who were devout members of the Apostolic Christian Church, would not question the truth of the statements. Said wrongful control by the Schinis over the land was permitted to continue because of the influence of the Apostolic Christian Church on its members.

33. The defendants and each of them conspired to insure that the defendant Schini remained in control of certain land which would have been available to the plaintiff by implying that if the plaintiff Schneider agreed to forego his legal remedies that the matter would be equitably resolved.

34. Further, the defendants and other members and officials of the Apostolic Christian Church did conspire to deny the plaintiff his legal rights by fraudulently inducing former counsel to refuse to pursue action.

35. Throughout this entire series of events, defendants Alfred Bahler and Edwin Bahler, in their capacities as influential members and Elder and Deacon, respectively, of the Apostolic Christian Church and on behalf of the Apostolic Christian Church, continually represented to plaintiff that the matter would be resolved fairly and amicably by the Church when, in fact, said defendants had no intention of settling said dispute but rather intended to continue to deprive plaintiff of the lands to which he was entitled. Said defendants, in fact, conspired to use the Church organization to obstruct any attempts at settlement and to obstruct and frustrate plaintiff's rights to the said farm land. Plaintiff, as a member of the Apostolic Christian Church and being widely influenced by its teachings and precepts, trusted said defendants and thereby did forego his rights to said farm land.

36. As a result of the foregoing, defendants, and each of them, have combined and conspired to deprive plaintiff of the equal protection of the laws and of his equal privileges and immunities under the law, namely, plaintiff's right to secure, hold and reap the benefits of private property as protected by the Fourteenth Amendment to the United States Constitution, all of which is contrary to 42 U.S.C. § 1985(3).

37. As a result of the foregoing, defendants, and each of them, have combined and conspired to deprive plaintiff of his right to secure, hold and reap the benefits of private real property, all of which is contrary to 42 U.S.C. § 1982.

## II.

It is elementary that the defendants' motion to dismiss which challenges the legal bases for the plaintiff's amended complaint requires this court to examine the amended complaint in the light most favorable to the plaintiff. This elementary principle is the backdrop for considering whether or not a claim is stated under 42 U.S.C. § 1982 or 42 U.S.C. § 1985(3). The discussion that follows will deal with the claim under these two statutes separately and in sequence.

42 U.S.C. § 1982 provides:

All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property.

The most recent judicial insight into this statute and its purposes is the opinion by Justice Stevens in *Memphis v. Greene,* 451 U.S. 100, at 120, 101 S.Ct. 1584, at 1596–97, 67 L.Ed.2d 769:

To effectuate the remedial purposes of the statute, the Court has broadly construed this language to protect not merely the enforceability of property interests acquired by black citizens but also their right to acquire and use property on an equal basis with white citizens. Thus, in *Hurd v. Hodge,* 334 U.S. 24 [68 S.Ct. 847, 92 L.Ed. 1187], the Court refused to permit enforcement of private covenants imposing racial restrictions on the sale of property even though the legal rights of blacks to purchase or to sell other property were unimpaired. In *Jones [v. Alfred H. Mayer, Co.],* supra [392 U.S. 409, 88

S.Ct. 2186, 20 L.Ed.2d 1189 (1968)], we held that § 1982 "must encompass every racially motivated refusal to sell or rent." 392 U.S., at 421–422 [88 S.Ct. at 2193–94]. In *Sullivan v. Little Hunting Park, Inc.,* 396 U.S. 229 [90 S.Ct. 400, 24 L.Ed.2d 386 (1969)], we interpreted the term "lease" in § 1982 to include an assignable membership share in recreational facilities. In *Tillman v. Wheaton-Haven Recreation Assn., Inc.,* 410 U.S. 431 [93 S.Ct. 1090, 35 L.Ed.2d 403 (1973)], we extended that holding to cover a preference to purchase a nontransferable swim club membership. Although these cases broadly defined the property rights protected by § 1982, our cases, like the statutory language itself, all concerned the right of black persons to hold and acquire property on an equal basis with white persons and the right of blacks not to have property interests impaired because of their race. (footnotes omitted)

Of particular interest is the collection of cases found in footnotes 35 and 36 of *Memphis v. Greene* set out at 451 U.S., pages 122, 123, 101 S.Ct. at pages 1597, 1598.

An insightful summation of the legislative history of § 1982 is provided by Justice Stewart, speaking for the court in *Jones v. Mayer Co.,* 392 U.S. 409 at page 423, 88 S.Ct. 2186, at page 2194–97, 20 L.Ed.2d 1189:

> The crucial language for our purposes was that which guaranteed all citizens "the same right, in every State and Territory in the United States, ... to inherit, purchase, lease, sell, hold, and convey real and personal property ... as is enjoyed by white citizens ...." To the Congress that passed the Civil Rights Act of 1866, it was clear that the right to do these things might be infringed not only by "State or local law" but also by "custom, or prejudice." Thus, when Congress provided in § 1 of the Civil Rights Act that the right to purchase and lease property was to be enjoyed equally throughout the United States by Negro and white citizens alike, it plainly meant to secure that right against interference from any source whatever, whether governmental or private.

Indeed, if § 1 had been intended to grant nothing more than an immunity from *governmental* interference, then much of § 2 would have made no sense at all. For that section, which provided fines and prison terms for certain individuals who deprived others of rights "secured or protected" by § 1, was carefully drafted to exempt private violations of § 1 from the criminal sanctions it imposed. There would, of course, have been no private violations to exempt if the only "right" granted by § 1 had been a right to be free of discrimination by public officials. Hence the structure of the 1866 Act, as well as its language, points to the conclusion urged by the petitioners in this case—that § 1 was meant to prohibit *all* racially motivated deprivations of the rights enumerated in the statute, although only those deprivations perpetrated "under color of law" were to be criminally punishable under § 2.

In attempting to demonstrate the contrary, the respondents rely heavily upon the fact that the Congress which approved the 1866 statute wished to eradicate the recently enacted Black Codes— laws which had saddled Negroes with "onerous disabilities and burdens, and curtailed their rights ... to such an extent that their freedom was of little value ...." *Slaughter-House Cases,* 16 Wall. 36, 70 [21 L.Ed. 394]. The respondents suggest that the only evil Congress sought to eliminate was that of racially discriminatory laws in the former Confederate States. But the Civil Rights Act was drafted to apply throughout the country, and its language was far broader than would have been necessary to strike down discriminatory statutes.

That broad language, we are asked to believe, was a mere slip of the legislative pen. We disagree. For the same Congress that wanted to do away with the Black Codes *also* had before it an imposing body of evidence pointing to the mistreatment of Negroes by private individuals and unofficial groups, mistreatment unrelated to any hostile state legislation. "Accounts in newspapers North and

South, Freedmen's Bureau and other official documents, private reports and correspondence were all adduced" to show that "private outrage and atrocity" were "daily inflicted on freedmen ...." The congressional debates are replete with references to private injustices against Negroes—reference to white employers who refused to pay their Negro workers, white planters who agreed among themselves not to hire freed slaves without the permission of their former masters, white citizens who assaulted Negroes or who combined to drive them out of their communities. (footnotes omitted)

Two recent cases, one by a court of appeals and one by a district court, and both in the same vein, illustrate both the dimensions of and the limitations on relief under 42 U.S.C. § 1982. In *Woods-Drake v. Lundy,* 667 F.2d 1198 (5th Cir.1982), Judge Goldberg stated at page 1201:

It is well-established that whites have a cause of action under Section 1982 when discriminatory actions are taken against them because of their association with blacks. In *Sullivan v. Little Hunting Park, Inc.,* 396 U.S. 229, 90 S.Ct. 400, 404–405, 24 L.Ed.2d 386 (1969), plaintiff Sullivan, a white member of a private corporation organized to operate a community park, was expelled from the corporation for attempting to lease his home to a black family. The Supreme Court held that Sullivan's expulsion was in violation of Section 1982, reasoning that to allow discrimination against whites for advocating the rights of blacks "would give impetus to the perpetuation of racial restrictions on property." [396 U.S. 229] 90 S.Ct. 400, 404 [24 L.Ed.2d 386]. Thus, in keeping with the aims of the civil rights laws, the courts have held that denial of housing to whites because of their association with blacks violates Section 1982. *See Bills v. Hodges,* 628 F.2d 844, 845 (4th Cir.1980) (attempted eviction of white tenants because of their biracial dating and entertainment practices enjoined under Section 1982); *Bishop v. Pecsok,* 431 F.Supp. 34, 37 n. 4 (N.D.Ohio 1976) (denial of housing to white man because of wife's race violates

Section 1982); *Lamb v. Sallee,* 417 F.Supp. 282, 287 (E.D.Ky.1976) (denial of housing to a white tenant because of roommate's race violates Section 1982); *Walker v. Pointer,* 304 F.Supp. 56, 58–62 (N.D.Tex.1969), *cited with approval in Evans v. Tubbe,* 657 F.2d 661, 662, n. 2 (5th Cir.1981) (eviction of whites for entertaining black guests violates Section 1982). *See generally Developments in the Law—Section 1981,* 15 Harv.C.R.—C.L.Rev. 29, 75–76, 142–146 (1980).

In *Petrone v. City of Reading,* 541 F.Supp. 735 (E.D.Pa.1982), it states at page 739:

Plaintiff's § 1982 claims suffer from the same deficiency as do the § 1981 claims; they fail to allege an *appropriate* class-based discrimination. Both § 1981 and § 1982 evolve from the original Act of 1866 and are subject to similar construction. *Runyon v. McCrory,* 427 U.S. 160, 173–74, 96 S.Ct. 2586, 2595–96, 49 L.Ed.2d 415 (1976), *Tillman v. Wheaton-Haven Recreation Association,* 410 U.S. 431, 439–40, 93 S.Ct. 1090, 1094–95, 35 L.Ed.2d 403 (1973). The Supreme Court, addressing the issue at bar, specifically stated that § 1982 "deals only with racial discrimination and does not address itself to discrimination on grounds of religion or national origin". *Jones v. Alfred H. Meyer Co.,* 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968). Hence, plaintiff's § 1982 claims which are predicated upon heritage will be dismissed.

See also, *Shaw v. Cassar,* 558 F.Supp. 303 (E.D.Mich.1983); *Walker v. Pointer,* 304 F.Supp. 56 (N.D.Tex.1969); *Bendetson v. Payson,* 534 F.Supp. 539 (D.Mass.1982); *Lee v. Minnock,* 417 F.Supp. 436 (D.C.Pa.1976); *Clark v. Universal Builders, Inc.,* 706 F.2d 204 (7th Cir.1983); *Phillips v. Hunter Trails Community Assn.,* 685 F.2d 184 (7th Cir. 1982); *Cannon v. Teamsters,* 657 F.2d 173 (7th Cir.1981); *Harris v. Wissert,* 514 F.Supp. 1153 (E.D.Wisc.1981); and *Debose v. Mueller,* 552 F.Supp. 307 (N.D.Ill.1982).

The obvious legislative purpose of § 1982 was redress for racial discrimination. It is quite correct that it is possible

for persons of the white race to state a claim for racial discrimination under § 1982. See, especially, *Walker v. Pointer, supra.* It is beyond dispute on the record in this case, both in the pleadings and in the proceedings before the court on May 6, 1983 that all of the persons involved in this controversy are of the white race. The fatal flaw, however, is the total failure of this plaintiff to allege any *racially* motivated discrimination by *any* defendant. The record is totally void of any such allegation or suggestion even considering the obligation to read the complaint in the most favorable light to the plaintiff.

*Phiffer v. Proud Parrot Motor Hotel, Inc.,* 648 F.2d 548 (9th Cir.1980), cited here by plaintiff, provides a succinct statement of the elements of a § 1982 claim:

> We are guided, however, by precedent from other circuits which have wrestled with the question of the prima facie case under § 1982. In brief, the elements of proof in § 1982 actions may be deduced from the elements of a Title VII case for employment discrimination, as defined by the Supreme Court in *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this analysis, a plaintiff must prove:
>
> 1). that he or she is a member of a racial minority;
>
> 2). that he or she applied for and was qualified to rent or purchase certain property or housing;
>
> 3) that he or she was rejected; and
>
> 4) that the housing or rental opportunity remained available thereafter.
>
> *See Wharton v. Knefel,* 562 F.2d 550, 553–54 (8th Cir.1977); *Smith v. Anchor Building Corp.,* 536 F.2d 231, 233 (8th Cir.1976); *Williams v. Matthews Company,* 499 F.2d 819, 826 (8th Cir.), *cert. denied,* 419 U.S. 1021, 95 S.Ct. 495, 42 L.Ed.2d 294, and 419 U.S. 1027, 95 S.Ct. 507, 42 L.Ed.2d 302 (1974); *see also, Harper v. Hutton,* 594 F.2d 1091 (6th Cir. 1979); *cf. Robinson v. 12 Lofts Realty, Inc.,* 610 F.2d 1032 (2d Cir.1979).
>
> Racial motivation is not an element of the § 1982 prima facie case; only a racial impact need be shown. Defendants erro-

neously argue that we must follow an equal protection analysis and require that plaintiffs prove racial animosity, relying upon *Arlington Heights v. Metropolitan Housing Development Corporation,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). § 1982, however, represents an exercise of the power of Congress to eliminate the "badges and incidents" of slavery under the thirteenth amendment, and not strictly an attempt to effectuate the equal protection clause of the fourteenth amendment. *See Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968); *cf. Robinson v. 12 Lofts Realty, supra,* 610 F.2d at 1037, 1038. We cannot, therefore, analogize to equal protection cases.

Using plaintiff's cited authority as a guide here, there is a total failure to allege any racial motivation or racial impact whatsoever.

The plaintiff has failed to allege an essential element of claim under § 1982. This failure subjects the amended complaint to a dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

### III.

Section 1985(3) in part provides as follows:

> If two or more persons in any state or territory conspire—for the purpose of preventing or hindering the constituted authorities of any state or territory from giving or securing to all persons within such state or territory the full protection of the law—the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

Although § 1985(3) is part of the Ku Klux Klan Act, its application has not been limited to racially motivated discrimination.

In *Griffin v. Breckenridge,* 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971), the Supreme Court discussed the scope of § 1985(3) and stated that:

> That the statute was meant to reach private action does not, however, mean that

it was intended to apply to all tortious conspiratorial interferences with the rights of others. For, though the supporters of the legislation insisted on coverage of private conspiracies, they were equally emphatic that they did not believe, in the words of Representative Cook, "that Congress has a right to punish an assault and battery when committed by two or more persons within a State." *Id.,* at 485. The constitutional shoals that would lie in the path of interpreting § 1985(3) as a general federal tort law can be avoided by giving full effect to the congressional purpose—by requiring, as an element of the cause of action, the kind of invidiously discriminatory motivation stressed by the sponsors of the limiting amendment. See the remarks of Representative Willard and Shellabarger, quoted *supra,* at 100 [91 S.Ct. at 1797]. The language requiring intent to deprive of *equal* protection, or *equal* privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators action. The conspiracy, in other words, must aim at a deprivation of the equal enjoyment of rights secured by the law to all. (footnotes omitted).

The Court proceeded to enumerate the *prima facie* elements in § 1985(3): 1. The defendants must conspire; 2. For the purpose of depriving, either directly or indirectly any person or class of persons of equal protection of the law, or equal privileges and immunities under the law; 3. By an act done in furtherance of the object of the conspiracy; and, 4. An injury to another or property or deprivation of any right or privilege attendant to U.S. citizenship. Since it is equal protection the conspirators may not hinder, there must be some racial, or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators actions. Id. at 102, 91 S.Ct. at 1798.

The *Griffin* criteria is often restated and has been construed to require that the conspirators' actions must violate some law independent of § 1985(3). *Weiss v. Willow Tree Civic Association,* 467 F.Supp. 803 (S.C.N.Y.1979). *Vietnamese Fishermans*

*Association et al. v. Knights of the Ku Klux Klan,* 518 F.Supp. 993 (S.D.Tex.1981).

In *Byrd v. Local Union No. 24 International Brotherhood of Electrical Workers,* 375 F.Supp. 545, 551 (D.Md.1974), the court said that the invidious discriminatory animus required is that the § 1985(3) conspiracy alleged "must aim at a deprivation of equal enjoyment of rights secured by the law to all. In other words, the discrimination must be directed at a class of persons rather than an individual." The allegations in *Byrd* were that the construction trade unions discriminated against blacks and the court found a class-based discrimination. The necessity of class-based discrimination was also discussed in *McNally v. Pulitzer Pub. Co.,* 532 F.2d 69, 74 (8th Cir.1976). The court stated that although the Supreme Court "has not yet fully defined the types of class-based discrimination cognizable under § 1985(3), the Supreme Court has emphatically rejected the notion that the statute encompasses tortious acts which have no element of class discrimination." The absence of any allegations asserting a class-based discriminatory animus removes the case from the ambit of § 1985(3). *Id.*

■ Section 1985(3) reaches both racial and non-racial class-based discrimination. In *Hyden v. Board of Supervisors of Louisiana State University,* 417 F.Supp. 603 (E.D. La.1978), a teacher brought a civil rights action against the university alleging the wrongful denial of a promotion. The plaintiff asserted that he was a member of a class, sufficient under *Griffin,* of university professors who were discriminated against in their exercise of the first amendment privileges. The court discussed § 1985(3) and decided the statute was applicable to the institution because the plaintiff was a member of the definable class of university professors. However, courts have consistently rejected complaints containing mere conclusory allegations of deprivation of constitutional rights protected under § 1985(3). The § 1985(3) conspiracy claim requires a clear showing of class-based invidious purposeful and intentional discrimination.

*Baxley v. City of North Charleston*, 533 F.Supp. 1248 (D.S.C.1982).

 An allegation of religious discrimination may support a claim under § 1985(3). *Marlowe v. Fisher Body*, 489 F.2d 1057 (6th Cir.1973). However, the plaintiff must still present a *prima facie* case of class-based discrimination under *Griffin.* The plaintiff has not alleged that he is a member of a class nor has he designated a class which defendants have discriminated against. The amended complaint fails to state any basis for recovery under § 1985(3). Given the most favorable reading, the amended complaint merely alleges a conspiracy to interfere with one person's contractual relations, not with a class' ability to contract. Although paragraph 35 of the amended complaint contains an allegation that church membership is involved the defendants as well as the plaintiff are members of The Apostolic Christian Church. The plaintiff is indistinguishable from any "class of these defendants".

In *Taylor v. Brighton Corp.*, 616 F.2d 256 (6th Cir.1980), the court said "the gravamen of a claim under § 1985(3) is denial of *equal* protection or *equal* privileges and immunities; a conspiracy to deny everyone a given right is not actionable". The *Griffin* Court imposed the class-based-animus requirement as a means of confining § 1985(3) to its intended purpose: to provide a means of redressing deprivations of equality under the law. The plaintiff has not alleged unequal treatment. At the most, the plaintiff alleges a conspiracy to interfere with contractual relations—a tortious act not protected by § 1985(3). The closest that he comes to making any such allegation is in paragraph 35 of the amended complaint wherein he alleges that his church membership is involved. The plaintiff is similar to the defendant as he is a member of The Apostolic Christian Church.

For a recent analysis of § 1985(3) by this court, see *Hack v. Oxford Health Care, Inc.*, 562 F.Supp. 295 (N.D.Ind.1983). This court there stated:

> The requirement of state action for claims under 42 U.S.C. § 1985 has been considered by the Seventh Circuit in a

series of cases beginning with *Dombrowski v. Dowling*, 459 F.2d 190 (7th Cir. 1972), and *Cohen v. Illinois Institute of Technology*, 524 F.2d 818 (7th Cir.1975). In both of these decisions, Judge, now Justice, Stevens made a careful analysis of the historical foundation of § 1985 in light of the Supreme Court decision in *Griffin v. Breckenridge*, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971).

In *Griffin,* the Supreme Court held that a cause of action could be stated under § 1985(3) even if the conspirators were private persons, so long as there was an invidiously discriminatory animus behind the conspirators' action. 403 U.S. at 102 [91 S.Ct. at 1798]. In his analysis in *Dombrowski,* Judge Stevens noted that, in addition to Thirteenth Amendment rights and the right to interstate travel, § 1985 was meant to protect Fourteenth Amendment rights. In fact, the Civil Rights Act of 1871, from which § 1985 is derived, had been passed for that express purpose. 459 F.2d at 195, n. 13.

Based on this analysis, *Dombrowski* held that the requirement of "state involvement" survives *Griffin* in Fourteenth Amendment claims. *Id.* The court went on to hold that there is no deprivation of "equal protection of the laws" within the meaning of § 1985(3) if there is no state involvement whatsoever. 459 F.2d at 196. This same analysis was applied in the later *Cohen* case, which also held that state involvement is required to reach Fourteenth Amendment claims under 42 U.S.C. § 1985.

In *Murphy v. Mount Carmel High School, supra* [543 F.2d 1189 (1976) ], the Seventh Circuit affirmed the holdings in the *Dombrowski* and *Cohen* cases. *Murphy* involved a claim under § 1985(3) by a teacher who claimed a violation of his First Amendment rights to speak out on behalf of black people and women. Sustaining the dismissal in the district court, the Court of Appeals held that a federal cause of action under the Civil Rights Act of 1871 alleging an injury stemming from a purely private conspiracy to interfere with freedom of expression, without state

involvement, is not constitutionally supportable. 543 F.2d at 1192.

This court is also at a loss to find in this amended complaint any allegations of religious discrimination. All parties are members of the same church. The amended complaint simply reflects a family fuss within the same local church which does not even demonstrate disagreement as to church doctrine. (This court would be compelled to stay its hand on such doctrinal disputes under *Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969).) There is simply no allegation of religious discrimination in this amended complaint. The dispute here is highly personal and it is not within the jurisdiction of this court to resolve.

The plaintiff has not alleged any class of which he is a member that forms the basis of the alleged discriminatory conduct by these defendants. A most liberal reading of the amended complaint discloses the obvious: the alleged actions of the defendants were not class-based.

### IV.

The reasoning and result announced here is well supported by the same in the recent case of *Clark v. Universal Builders, Inc.,* 706 F.2d 2004 (7th Cir.1983), wherein the Court of Appeals dealt with claims under 42 U.S.C. § 1982 and § 1985(3).

For the foregoing reasons the plaintiff has failed to allege any basis for federal question jurisdiction under 28 U.S.C. § 1331 and has failed to state any claim for relief under either 42 U.S.C. § 1982 or 42 U.S.C. § 1985(3). The amended complaint here is DISMISSED at plaintiff's costs.