**GINSU PRODUCTS, INC., Defendant, Cross-Plaintiff, and Appellant,**

v.

**DART INDUSTRIES, INC., Plaintiff, Cross-Defendant, and Appellee.**

**No. 85–1533.**

United States Court of Appeals, Seventh Circuit.

Argued Oct. 28, 1985.

Decided March 6, 1986.

As Amended March 21, 1986.

Michael J. Jassak, Habush, Habush & Davis, Milwaukee, Wis., for defendant, cross-plaintiff, and appellant.

Edward T. Hackney, West Bend Co., West Bend, Wis., for plaintiff, cross-defendant, and appellee.

Before CUMMINGS, Chief Judge, BAUER, Circuit Judge, and CAMPBELL, Senior District Judge.*

* The Honorable William J. Campbell, Senior District Judge of the Northern District of Illinois, is sitting by designation.

WILLIAM J. CAMPBELL, Senior District Judge.

Ginsu Products, Inc. appeals a judgment of the United States District Court for the Eastern District of Wisconsin, Judge John W. Reynolds presiding, holding that a binding long-term exclusive dealings contract between it and the West Bend Company never existed. For the reasons set forth below, we affirm the district court ruling.

West Bend Company is a division of Dart Industries, Inc. located in West Bend, Wisconsin. West Bend manufactures household appliances. Ginsu is a Rhode Island corporation with its principal place of business in Rhode Island. Ginsu advertises unique low-cost household items over television which are available exclusively through Ginsu. The items are offered on a mail order or C.O.D. basis. Ginsu depends on the items it markets as being unique. Otherwise, television viewers would find it easier to buy the item locally.

From August, 1981 to June, 1982 Ginsu and West Bend engaged in continuing negotiations in an attempt to establish a business contract whereby Ginsu would sell low-cost woks[1] manufactured by West Bend to the general public. Despite the fact that several issues were never resolved both parties were optimistic a final resolution of all issues could be reached. Both sides anticipated a public demand for the woks. With this in mind and before all issues were resolved, the parties committed funds on a preliminary basis to ascertain the potential popularity of the wok. For West Bend, this translated into the manufacture of an initial 5,000 woks. In return, Ginsu conducted an advertising "test run" over television.

During the ten-month period from August, 1981—June, 1982 and while the test run was being conducted, an exchange of a series of proposed comprehensive contracts occurred. Several issues remained unresolved as of June, 1982, exclusivity provi-

1. A wok is a bowl-shaped cooking utensil used especially in the preparation of Chinese food and vegetables.

sions being the primary problem. Finally, on June 17, 1982 West Bend expressed its desire to withdraw from the program. Ginsu objected, claiming a binding contract had been formed via a February 15, 1982 letter (significantly, the only document signed by both parties) (see Appendix A). Ginsu believed the February 15 letter, drafted by West Bend, committed West Bend to produce up to 1,000,000 woks on a long-term basis exclusively designed for Ginsu. West Bend rejected such a contention, stating the letter discussed the exclusivity issue but concluded a need to form a comprehensive, binding contract was necessary in the future. After withdrawing in June, West Bend delivered 19,471 woks to Ginsu. This represented the number of orders Ginsu received from its preliminary television test run. Ginsu, angered by West Bend's withdrawal, failed to pay in full for the woks delivered. Instead, it filed suit in the United States District Court for the District of Rhode Island claiming breach of a long-term exclusive dealings contract. West Bend commenced the instant action in the United States District Court for the Eastern District of Wisconsin seeking payment for the woks delivered to Ginsu. Ginsu's Rhode Island action was transferred to Wisconsin and Consolidated with West Bend's Wisconsin action. Judge Reynolds presided over a non-jury trial. He heard testimony from officials from both sides and reviewed documents from the August, 1981—June, 1982 time period. He ruled no binding long-term exclusive dealings contract had been created. He also ordered Ginsu to pay West Bend $75,200.77 in damages resulting from its failure to pay the amount due for the 19,471 woks delivered by West Bend. The district court had jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332. Personal jurisdiction was proper in the Eastern District of Wisconsin since Dart Industries (through West Bend) conducts business in the district and the claims arose in the district. This court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

■ In reviewing the lower court ruling we are held to the clearly erroneous standard set forth in Rule 52(a) of the Federal Rules of Civil Procedure. This is because the issue of intent to enter into a contract is deemed to be a question of fact. See, for example, *Peninsular Carpets, Inc. v. Bradley Homes, Inc.*, 58 Wis.2d 405, 206 N.W.2d 408 (1973). Ginsu argues for a broadening of the clearly erroneous standard of review under the circumstances of this case because the district court relied heavily on documentary evidence and drew inferences from undisputed facts. In advancing this argument Ginsu relies on a line of cases such as *Clark v. Universal Builders, Inc.*, 706 F.2d 204 (7th Cir.1983) and *Yorke v. Iseri Produce Co.*, 418 F.2d 811 (7th Cir.1969). These cases followed the general rule enunciated in *Mayo v. Pioneer Bank & Trust Co.*, 297 F.2d 392, 395 (5th Cir.1961):

> "Under Rule 52(a) of the Federal Rules of Civil Procedure ... the trial judge's findings of fact are conclusive unless clearly erroneous, but when the factual determination is primarily a matter of drawing inferences from undisputed facts or determining their legal implications, appellate review is far broader than where disputed evidence and questions of credibility are involved."

■ The law of *Clark, Yorke* and *Mayo* has recently been rejected by the United States Supreme Court in *Anderson v. City of Bessemer City, North Carolina*, — U.S. ——, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). In *Anderson* the Supreme Court endorsed a view of the clearly erroneous standard which unmistakably limits appellate review to a very limited scope:

> Although the meaning of the phrase "clearly erroneous" is not immediately apparent, ... The reviewing court oversteps the bounds of its duty under Rule 52 if it undertakes to duplicate the role of the lower court. "In applying the clearly erroneous standard to the findings of a district court sitting without a jury, appellate courts must constantly have in mind that their function is not to

decide factual issues *de novo.*" *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129 (1969). If a district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the fact-finder's choice between them cannot be clearly erroneous. *United States v. Yellow Cab Co.,* 338 U.S. 338, 342, 70 S.Ct. 177, 179, 94 L.Ed. 150 (1949); see also *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.,* 456 U.S. 844, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982).

*This is so even when the district court's findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts.* To be sure, various Courts of Appeals have on occasion asserted the theory that an appellate court may exercise *de novo* review over findings not based on credibility determinations. See, *e.g., Orvis v. Higgins,* 180 F.2d 537 (CA2 1950); *Lydle v. United States,* 635 F.2d 763, 765, n. 1 (CA6 1981); *Swanson v. Baker Industries, Inc.,* 615 F.2d 479, 483 (CA8 1980). This theory has an impressive genealogy ..., but it is impossible to trace the theory's lineage back to the text of Rule 52, which states straightforwardly that "findings of fact shall not be set aside unless clearly erroneous." That the Rule goes on to emphasize the special deference to be paid credibility determinations does not alter its clear command: *Rule 52 "does not make exceptions or purport to exclude certain categories of factual findings from the obligation of a court of appeals to accept a district court's findings unless clearly erroneous." Pullman-Standard v. Swint,* 456 U.S. 273, 287, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66.

The rationale for deference to the original finder of fact is not limited to the superiority of the trial judge's position to make determinations of credibility. The trial judge's major role is the determination of fact, and with experience in fulfilling that role comes expertise. Duplication of the trial judge's efforts in the court of appeals would very likely contribute only negligibly to the accuracy of fact determination at a huge cost in diversion of judicial resources ... As the court has stated in a different context, the trial on the merits should be "the 'main event' ... rather than a 'tryout on the road.'" *Wainwright v. Sykes,* 433 U.S. 72, 90, 97 S.Ct. 2497, 2508, 53 L.Ed.2d 594 (1977) ... This is not to suggest that the trial judge may insulate his findings from review by denominating them credibility determinations, for factors other than demeanor and inflection go into the decision whether or not to believe a witness. Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it. Where such factors are present, the court of appeals may well find clear error even in a finding purportedly based on a credibility determination. See, *e.g., United States v. United States Gypsum Co., supra,* 333 U.S. at 396, 68 S.Ct. at 542. But when a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and factually plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error. Cf. *United States v. Aluminum Co. of America,* 148 F.2d 416, 433 (CA2 1945); *Orvis v. Higgins, supra,* at 539–40. *Id.* 105 S.Ct. at 1511–13. [Emphasis added.]

This language is quite unambiguous and has been followed swiftly by the federal appellate courts. In *Planned Parenthood Association/Chicago Area v. Chicago Transit Authority,* 767 F.2d 1225 (7th Cir. 1985) we noted:

While we have stated before that our "discretion within the 'clearly erroneous' standard is slightly broader" in a case where the district court relies in part on documentary evidence, *Clark v. Universal Builders, Inc.*, 706 F.2d 204, 206 (7th Cir.1983), this view has recently been discredited by the Supreme Court, *Anderson v. City of Bessemer City,* —— U.S. ——, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985) (theory that appellate court can conduct more stringent review of factual findings based on documentary evidence cannot be traced to the text of Rule 52). *Id.* at 1229.

Similarly, the Fourth, Sixth, Eighth, and Ninth Circuits have recently cited *Anderson, supra,* as representing the new governing guidelines concerning the Rule 52(a) clearly erroneous standard of review. (See *Collins v. City of Norfolk, Virginia,* 768 F.2d 572, 573 (4th Cir.1985); *Henry v. Lennox Industries, Inc.*, 768 F.2d 746, 749–750 (6th Cir.1985); *In Re Mossie,* 768 F.2d 985, 987 (8th Cir.1985); *Antonio v. Wards Cove Packing Co., Inc.*, 768 F.2d 1120, 1125 (9th Cir.1985)). Hence, in the case at bar, Ginsu's assertion that we may "relax" or "broaden" our standard of review because the district court relied on documentary evidence and/or undisputed facts must fail.

In reviewing Ginsu's arguments on appeal, our task is to review key documents and witness testimony looking for a district court's embracing of a pattern of events "... so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it." See *Anderson,* supra 105 S.Ct., at 1512–13. If this initial review leads us to such a conclusion, the practical reality of the matter is that a review of additional documents and the testimony of additional witnesses may be in order at the appellate level before the clearly erroneous label is capable of being affixed to a district court decision. Yet, if a district judge has made a finding consistent with the testimony of one or more witnesses and a plausible story is advanced

not internally inconsistent, clear error can virtually never be adjudged. See *Anderson,* supra at 1513.

■ Applying this stiff standard of review to the case at bar, it becomes apparent Ginsu has failed to meet its burden, i.e., "We are not left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). On p. 13 of its brief, Ginsu acknowledges, "The grossly over-simplified issue presented ... in this matter is ... did Ginsu and West Bend intend, by executing the February 25, 1982 letter[2] agreement, to enter into an exclusive dealings contract, whereby West Bend obligated itself to supply Ginsu with an electric, variably-thermostatically controlled, non-immersible wok for Ginsu's television marketing wok program." The language of the February 1982 letter could be read to indicate, as the district court concluded, that a comprehensive contract needed to be developed and signed in the future before a long-term contract would be entered into by the parties. To review: the first sentence of the letter states its purpose is to "confirm the understandings" derived from a series of meetings between the parties. The second sentence states, "As the matter currently stands, both West Bend and Ginsu Products, Inc. recognize a need for a comprehensive contract encompassing the whole program." The third sentence recognizes there are time constraints which could jeopardize the program, that the exclusivity issue is the major stumbling block, and that if this issue is resolved, an anticipated "complete contract" could be formed. Hence, the first sentences of the letter could easily allow the district court to conclude the letter represented an interim negotiating tool employed to resolve a material issue which could lead to a long-term binding contract.

The third paragraph of the letter solidifies the notion that exclusivity is a material issue to both parties that must be resolved.

---

**2.** The February 25 letter is really the February 15 letter mentioned above (see Appendix A).

Ginsu signed West Bend's February 15 letter on February 25.

The fourth paragraph states West Bend "is prepared to, and should the program go forward, does grant Ginsu exclusivity" and that "this exclusivity shall extend from the date of the signing of an overall contract." The district court concluded that West Bend's granting of exclusivity was something Ginsu would attain in the future when conditions on exclusivity and other matters are resolved and incorporated into a formal contract. Such a conclusion is not clearly erroneous. Indeed, in the next paragraph it is stated, "In order to define the conditions for continuing exclusivity, upon which we will go forward, it is important that we arrive at the level of usage necessary for continued exclusivity prior to signing of the final contract ... we need to determine a product sales level below which Ginsu will terminate the exclusivity ..." Hence, it is perfectly conceivable the district court could conclude the "parameters" surrounding the material issue of exclusivity had not yet been defined and therefore the issue had not been resolved.

In the last paragraph there is verbiage which conceivably could be interpreted as creating a binding contract:

> In order to resolve all of our concerns about exclusivity and to get over the hurdle of reducing them to writing, please review carefully the provisions above and if they accurately affect our agreement, please acknowledge by signing a copy of this letter in the space provided and returning it to me.

Arguably, Ginsu could have thought it created a binding contract by signing the letter, "resolving all ... concerns about exclusivity." However, this speculation is inappropriate. As stated in *Anderson*, supra, "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." 105 S.Ct. at 1512. The

district court's conclusion as to the February 1982 letter is plausible (at the very least) in this instance. As the Supreme Court stated in *Yellow Cab*, supra, "... a choice between two permissible views of the weight of the evidence is not 'clearly erroneous'." 338 U.S. 338 at 342, 70 S.Ct. 177 at 179.[3]

Ginsu cites section 402.204 of the Wisconsin statutes to advance the following Uniform Commercial Code principles:

(1) A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract.

(2) An agreement sufficient to constitute a contract for sale may be found even though the moment of its making is undetermined.

(3) Even though one or more terms are left open, a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy.

Ginsu concludes that the fact that issues such as exclusivity are left unresolved in the February 1982 letter does not necessarily mean an enforceable contract was not created. The key, according to Ginsu, is whether there is sufficient evidence showing an intent to agree.

[4] Ginsu's recitation of the relevant U.C.C. law is correct. A court has the latitude to declare a contract has been formed by the conduct of the parties, even if certain terms are left open or if the moment of its making is unascertainable. However, a court must still make the threshold factual finding that an intent to contract existed. The facts of each case must still be weighed before the applicable U.C.C. provisions are used as a vehicle to rule a contract existed.

The district court has made its factual findings as to intent and they are not clearly erroneous. For example, the conduct of

---

**3.** We also note a November 10, 1981 letter from West Bend to Ginsu and a November 12, 1981 inter-office correspondence of West Bend's as examples of additional documentary evidence supportive of the district court's factual findings.

the parties cited by Ginsu does not leave us with the definite and firm conviction that a mistake has been committed. See *United States v. United States Gypsum Co.*, supra, at 68 S.Ct. 542. The fact that West Bend expended funds to engineer and produce a low-cost wok and shipped woks to Ginsu is not inconsistent with the plausible theory embraced by the district court that a short-term agreement was consummated by the parties to determine how popular the wok program would be. West Bend's expenditures would not be wasted should a long-term agreement have failed to be reached since it anticipated a market for the wok irregardless of whether it was sold to Ginsu (hence, the importance of resolving the exclusivity issue). Despite these expenditures, material issues such as exclusivity still had to be resolved before a long-term contract was ratified.

The frequency of meetings and correspondences detailed by Ginsu is not in itself conclusive as to the issue of whether a long-term contract existed. Ginsu also infers that only after the discovery of an engineering defect in the wok did West Bend indicate it was not bound by a long-term agreement. This inference demands a credibility determination well within the province of the district court. In this case the individuals who held primary roles in the relevant negotiations testified before the district court. The district court listened to and observed the demeanor of these individuals and reached conclusions not internally consistent or implausible with the key documents provided to us. Therefore, clear error has not been established and "We will not ransack the record, searching for mistakes." *Casillas v. United States Navy*, 735 F.2d 338, 342–343 (9th Cir.1984).

The ruling of the district court is hereby AFFIRMED.

## APPENDIX A

THE WEST BEND. COMPANY
WEST BEND, WISCONSIN 53095
Division of Dart Industries Inc.

EXHIBIT
637

(25)

February 15, 1982

Mr. Edward J. Valenti
Ginsu Products, Inc.
59 West Shore Road
Warwick, RI 02889

Becher DEPOSITION
EXH. FOR IDENT.
CLAUDIA RATHBUN
NOTARY PUBLIC, R.I.

Dear Ed:

This will confirm the understandings we reached during your visit to West Bend on January 13th and our subsequent meeting of January 20th at the Housewares Show.

As the matter currently stands, both West Bend and GINSU Products, Inc. recognize a need for a comprehensive contract encompassing the whole program. However, Ed, given the time constraints we are facing and the fact that the real issue that jeopardizes the program is exclusivity, this letter will address only exclusivity. Both of us recognize that if we have an agreement on exclusivity, we must move rapidly toward a complete contract.

GINSU's marketing program focusing heavily on television promotion with direct call-in or mail-in purchases requires product exclusivity and differentiation. GINSU has projected that if the program is a success, it could, in fact, sell in excess of one million Woks. You have pointed out that if the program is a failure, you will be able to make that determination very quickly. To this end and as an initial determination of the viability of the program, you plan a test beginning on approximately March 20th with the results being available during the week beginning Monday, April 5th. West Bend recognizes that the March 20th test is conditional upon West Bend having available 5,000 GINSU Woks for fulfillment.

West Bend firmly believes that it will be able to meet the production schedule we previously discussed. In the unlikely event that something should disrupt our production schedule, I will notify you immediately.

Should GINSU go forward with the program, it will expend substantial sums on television advertising. West Bend, for its part, will be incurring substantial risk with regard to finished goods, raw material inventories and commitments in order to support GINSU's program. West Bend is prepared to, and should the program go forward, does grant GINSU exclusivity for electric, variably thermostatically controlled non-immersible Woks of the type you have reviewed and will be purchasing. West Bend further agrees that it shall not sell during the term of this agreement, a Wok that is confusingly similar in exterior appearance to the Wok we will be selling you. West Bend agrees that this exclusivity shall extend from the date of the signing of an overall contract and for the term of GINSU's program, which is expected to be eighteen months, ~~and/or until~~ West Bend's retail campaign on the GINSU Wok produces less than 25,000 GINSU Woks per year. *plus such time as*

While we anticipate this program going forward with every success, we recognize that the program could be a failure. In order to define the conditions for continuing exclusiveity, upon which we will go forward, it is important that we arrive at the level of usage necessary for continued exclusivity prior to signing of the final contract. Stated in another way, we need to determine a product sales level below thich GINSU will terminate the exclusivity which would be needed if the program were successful.

GINSU acknowledges that West Bend will be continuing to market its existing line of Woks and may over the period of the program make additions to its current Woks, provided, however, that such additional Woks may not be electrically thermostatically controlled, non-immersible Wok, or any electric Wok primarily black in color, or any Wok the exterior appearance of which is confusingly similar to the Wok we will be selling you. GINSU acknowledges and agrees that West Bend will be manufacturing and selling to Tupperware a Wok similar to the GINSU Wok during the period of the program.

At the end of the program, West Bend will make a good faith attempt to market the GINSU Wok with the GINSU trademark through whichever channels of retail distribution it should choose. The success of West Bend's marketing effort with the GINSU Wok will be determined to be successful if West Bend sells at least 25,000 GINSU Woks per year. West Bend agrees it will pay a royalty of 4% to GINSU for the use of the trademark, GINSU, and in recognition of the market development accomplished by GINSU in its television advertising program. The royalty shall be 4% computed upon a net net sales figure less selling expenses and returns. The royalty shall be payable only on the GINSU Wok with the GINSU trademark during the period of retail marketing by West Bend. Should West Bend sell less than 25,000 units, then its marketing attempt shall be deemed unsuccessful and it shall cease to market the GINSU Wok and this agreement shall be terminated.

GINSU Products, Inc. shall have unconditional exclusivity on the GINSU Wok manufactured for them by West Bend, during the entire term of this agreement, however, if the competition introduces a new product which seriously jeopardizes the marketing position of West Bend and GINSU Products, Inc., the parties agree to renegotiate this agreement in a manner which will be mutually advantageous.

In order to resolve all of our concerns about exclusivity and to get over the hurdle of reducing them to writing, please review carefully the provisions above and if they accurately affect our agreement, please acknowledge by signing a copy of this letter in the space provided and returning it to me.

Read and Agreed to:

*Edward J. Valenti Pre....t*

Edward J. Valenti
GINSU Products, Inc.

Dated: 2/25/82

Sincerely yours,

*John C. Lyons*

John C. Lyons
Direction, Premium &
Incentive Merchandising

JCL/6330/bwz

**GINSU, for its part, agrees that it will purchase Woks for its contemplated GINSU Wok program exclusively from West Bend.