NOVELLY OIL COMPANY, and Goldstein Oil Company, d/b/a Apex Oil Company, Plaintiffs-Appellants,

v.

MATHY CONSTRUCTION COMPANY, Defendant-Respondent.

Court of Appeals

*No. 87–2192. Submitted on briefs October 10, 1988.—Decided November 17, 1988.*

(Also reported in 433 N.W.2d 628.)

For the plaintiffs-appellants the cause was submitted on the briefs of *Michael W. Gill* and *Hale, Skemp, Hanson & Skemp,* of La Crosse.

For the defendant-respondent the cause was submitted on the brief of *L. E. Sheehan* and *Moen, Sheehan, Meyer & Henke, Ltd.,* of La Crosse.

Before Dykman, Eich and Sundby, JJ.

EICH, J. Novelly Oil Company and Goldstein Oil Company, d/b/a Apex Oil Company, appeal from a judgment dismissing their complaint against Mathy Construction Company. Apex sued Mathy for amounts due on an alleged oral contract for the purchase of asphalt. The trial court dismissed the action, ruling that no contract was ever formed because the parties' minds had never met on the essential elements of their agreement. We agree with that conclusion and affirm the judgment.

Apex is a manufacturer and seller of petroleum products, including asphalt used in road construction and paving. Its main plant is located in Wood River, Illinois. Mathy is a road builder in La Crosse County, Wisconsin. On July 16, 1986, James Lager, a purchaser for Mathy, and Kenneth Fenton, one of Apex's marketers, discussed the possibility of Mathy purchasing a quantity of asphalt in early August. Apex maintains that this conversation resulted in an oral contract whereby Mathy agreed to purchase approximately 30,000 barrels of asphalt, to be picked up at Apex's Illinois plant for shipment up the Mississippi River to La Crosse. Mathy acknowledges that Lager and Fenton agreed on the price and certain other details of the transaction, but contends that no agreement was ever reached as to the type and grade of the asphalt and, further, that any agreement was contingent upon the availability of barge transportation to move the goods from Wood River to La Crosse.

Lager never secured a barge and Mathy never picked up the asphalt. Apex sued to recover the contract price, and the trial court dismissed the action, holding that because Lager's and Fenton's minds had never met on the essential terms of the agreement, there was no contract. Other facts will be discussed below.

Apex correctly points out that the case is governed by the Uniform Commercial Code, placing principal reliance on sec. 402.204(3), Stats., which states that a contract does not fail for indefiniteness "[e]ven though one or more terms are left open" as long as there is "a reasonably certain basis for giving an appropriate remedy." Citing that section, Apex argues that even though Lager's and Fenton's July 16 communications left several terms open for future

resolution, a binding sales contract for 30,000 barrels of asphalt was nonetheless formed on that date.

Apex also refers us to a law review article on the subject in which the author states that the "strict common law view" requiring inclusion of "all material terms" in the contract has been eased by the code to the extent that "the fact that one or more essential terms is missing or is to be agreed upon in the future will not inevitably signify lack of intent." Edwards, "Contract Formulation Under Article 2 of the Uniform Commercial Code," 61 Marq. L. Rev. 215, 219–20 (1977). Even that commentator recognizes, however, that the question still remains in each case "whether a proposal which does not include all material terms nevertheless manifests intent to be bound," *id.* at 220, and we agree with that proposition.

The so-called "liberality" of sec. 402.204(3), Stats., "does not eliminate the basic requirement of contract law that the parties in fact reach an agreement." 2 Anderson, Uniform Commercial Code sec. 2–204:18, at 206 (1982) (footnote omitted).

> [I]t is still essential that there be an agreement of the parties. While the Code does not require agreement as to all material terms in order to constitute a contract, it is essential that there be agreement that there be a contract in spite of such open areas. Although [sec. 402.204(3)] "broadens the range of factors available for the court's consideration in determining whether there has been an offer and seasonable acceptance ... these factors are available only as evidence to assist the court in determining if the parties actually reached an agreement. They cannot cause a contract to be formed where there has in fact been no [agreement] between the parties." *Id.* sec. 2–204:21,

at 207–08 [footnotes omitted, ellipses and bracketing in original].

While the code empowers courts to declare that a contract has been formed even if certain material terms are left open, we "must still make the threshold factual finding that an intent to contract existed." *Ginsu Products, Inc. v. Dart Industries, Inc.,* 786 F.2d 260, 265 (7th Cir. 1986) (applying Wisconsin law). Thus, even though the parties' disagreement as to a material term may not necessarily prevent the formation of a valid contract, "'when a dispute over material terms manifests a lack of intention to contract, no contract results,' and when it is clear that [the parties] disagree as to material terms there is no sale or contract to sell." 2 Anderson sec. 2–204:22, at 208 (footnote omitted). Whether the parties intended a binding agreement is determined under the common law of contracts. *Id.* sec. 2–204:18, at 206.

Wisconsin law has long recognized that "[t]he essence of a contract is that the minds of the parties thereto must meet on the same thing." *Zuelke v. Gergo,* 258 Wis. 267, 271, 45 N.W.2d 690, 692 (1951). And "[t]here is no meeting of the minds where the parties do not intend to contract"; that is, where they fail to "agree on the essential terms and conditions of the contract." *Household Utilities, Inc. v. Andrews Co.,* 71 Wis. 2d 17, 29, 236 N.W.2d 663, 669 (1976). The question of the parties' intent is one of fact. *Peninsular Carpets, Inc. v. Bradley Homes, Inc.,* 58 Wis. 2d 405, 413–14, 206 N.W.2d 408, 412 (1973); *Ginsu Products,* 786 F.2d at 262. In reviewing factual questions, we apply the "clearly erroneous" rule: we will uphold the

trial court's findings unless they are clearly errone-
ous. *Noll v. Dimiceli's, Inc.,* 115 Wis. 2d 641, 643, 340
N.W.2d 575, 577 (Ct. App. 1983).

Lager and Fenton were the primary witnesses at
trial. Fenton testified that he had sold a quantity of
120–150 pen grade asphalt to Lager in June, 1986,\*
and that Lager contacted him again in mid-July about
possible additional purchases. According to Fenton,
Lager asked whether Apex could provide 30,000
barrels (approximately 5,300 tons) of asphalt, at a
price of $75 per ton, to be picked up by barge at Wood
River sometime between July 30 and August 4, 1986.

Fenton verified the price and availability of the
asphalt with his superiors and called Lager back.
Fenton testified that he could not remember any of
the specifics of the conversation. As much as he could
say was that Lager told him something to the effect
that "if I [Fenton] could do it, you know we would do
it." He stated that "[t]he substance of that conversa-
tion was ... to purchase some 120–150 pen grade
asphalt with the possibility of changing to 85–100 pen
grade as long as he gave me certain days notice" and

---

\* The dissent faults our failure to "attach sufficient signifi-
cance to the previous dealings between the parties," referring, we
assume, to this single prior transaction. We agree that a prior
course of dealing between the parties can be significant. Indeed, it
is sometimes said to be "the best guide to the interpretation of the
contract." 2 Anderson sec. 2–208:6, at 309 (footnote omitted).

But the code itself defines "course of performance" as
"involv[ing] *repeated* occasions for performance." Sec. 402.208(1),
Stats., (emphasis added). "[I]t necessarily follows that there is no
course of performance when there are merely intermittent casual,
or isolated ... performances. A single incident ... does not
constitute a course of dealings or performance." 2 Anderson sec.
2–208:5, at 309 (footnotes omitted).

that Lager "seemed appreciative of the deal." Fenton was also questioned about testimony in a pretrial deposition in which he stated that he recalled Lager saying "it sounds good" toward the end of their conversation.

Finally, Fenton testified that Lager never expressly told him that the sale was "contingent" on the availability of a barge to pick up the asphalt at Apex's Illinois plant, although he conceded that if no barge was available, it would be impossible to deliver any asphalt to Mathy. He also acknowledged that when their conversation ended, Lager still had not decided on the grade of asphalt he wanted to order.

Fenton then prepared a "confirmation letter," which he sent to Lager through the facsimile or "Fax" immediate transmission process. The letter begins by stating that its purpose was "to confirm our July 16, 1986 sales agreement ...." It outlines the price, quantity and grade (120–150 pen) of the asphalt, states that delivery was to be f.o.b. Wood River, and concludes: "Buyer to give Apex 7 days notice if pen grade is changed [to] 85–100 pen." Lager acknowledged receiving the letter but, believing it to be no more than a summary of their discussions to date, "confirming price and availability of [asphalt] within the confines of [what] we were looking for," he did not "attach[ ] any significance to it." A day or so later, Fenton sent Lager a written "Sales Agreement" for the asphalt, asking him to sign and return it. Lager did neither.

Fenton testified that he telephoned Lager on July 20 or 21 to see when Mathy would be picking up the asphalt and that Lager "indicated ... it would be around August 1st ...." Apex did not stock 120–150 pen grade asphalt and, between July 24 and 30,

manufactured 30,000 barrels of the product for eventual sale to Mathy.

Fenton testified that he called Lager several more times between July 25 and August 7 to inquire about the delivery date, and that Lager advised him he was having difficulty locating a barge. According to Fenton, Lager eventually told him he could not take delivery of the asphalt because he had been unable to secure a barge. Fenton also said that Lager told him he did not believe there was any binding contract for the asphalt. Delivery was never accomplished and Apex subsequently mixed the asphalt with other products and sold it at a loss.

Lager acknowledged that in their July 16 telephone conversations, he and Fenton settled on a price and a "span of time" for delivery of the asphalt, and that while Mathy "could probably use 120–150 pen grade asphalt, [it] would like to reserve the right to change that to 85–100 ... at a later ... time ...." He testified that he also discussed the possibility of a third grade of asphalt—"vis. grade"—in these conversations, although Fenton did not remember any such statements. Lager also stated that he never specifically told Fenton that the sale was to be "contingent" on the availability of a barge because "it goes without saying that you must have a barge to ship the material in." As indicated, Fenton did not disagree with that observation.

Lager also testified that he never understood that he and Fenton had a firm contract because "a number of things ... had not been resolved—the type of product, the availability of cargo movement. We just wouldn't do business that way." He also stated that he was unaware that Apex had to manufacture the asphalt, thinking they carried it in stock, and that he

had no idea Apex had begun producing the 120–150 pen grade product for Mathy until he received a note from Fenton on August 7 so informing him. Upon receiving the note, Lager immediately responded:

> As I informed you during our telephone conversations of July 30, and August 6, the availability of a barge to lift the A.C. 120/150 pen. is still in doubt. Additionally, I informed you we had not yet concluded we would need 120/150, possibly, we would want an 85/100 pen. or a vis. grade material for exchange purposes.
>
> The timing of this anticipated shipment is still contingent on the above options.

Based on this evidence, the trial court made the following findings of fact (among others):

> 6.  That on July 16, 1986, Fenton and Lager had several phone conversations regarding the purchase by Mathy and sale by Apex of approximately 30,000 barrels of asphalt to be delivered by Apex f.o.b. Wood River, Illinois, to a barge rented or chartered by Mathy between July 30, 1986, and August 4, 1986.
>
> 7.  The parties discussed a contingency regarding grade of asphalt to be delivered. That in such conversations, Lager said to Fenton that the asphalt to be purchased/sold would probably be a product designated as pen 120–150, but that Mathy may wish to designate another pen grade with different specifications such as 85–100, prior to the date of delivery/pickup. Fenton told Lager that the change in specs would not be a problem, provided Mathy notified Apex of the change 7 days before lifting the product.
>
> 8.  That in their conversations on July 16, 1986, Fenton and Lager reached agreement on the terms of the purchase/sale relating to price, quan-

621

tity, place of pickup/delivery, method of transport, responsibility for transport and expected time frame for pickup/delivery, among others.

9. By virtue of said conversations, Fenton believed there was a firm contract, while Lager believed that there was no contract, only a proposed sale by Apex, unless there was a barge available.

. . . .

14. Lager assumed that Fenton understood the uncertainty of barge availability, and that barge availability was a contingency to the making of any contract; whereas Fenton on the other hand assumed that barge availability was no problem for Mathy.

. . . .

17. Beginning in late July and continuing into early to mid-August, Fenton and Lager talked on several occasions regarding Lager's efforts to find a barge for Mathy to transport the asphalt. Lager reported that the barge he originally believed was available to arrive for pickup between July 30 and August 4 could not make it that soon, and Fenton sent a correspondence to Lager extending the "window" for pickup. When in early August Lager did not identify a barge, Fenton began to press Lager for a barge nomination and did so repeatedly. Lager did not nominate a barge and in mid-August Lager told Apex that they would not pick up the asphalt due to the lack of a barge.

. . . .

19. Apex was unfamiliar with how Mathy did business, and Mathy was unfamiliar with how Apex did business, and there was misunderstanding between the parties as to the terms of the contract. Apex assumed that time of delivery was

622

the only questions [sic], and Mathy assumed that barge availability was a contingency.

In addition, the trial court stated in its memorandum decision that Lager's only response to Fenton's recitation of specifications in their second telephone call was that it "sounds good," and that from that point on Fenton assumed that a valid contract existed, while Lager assumed that any binding agreement was contingent not only on barge availability but also on Mathy's designation of the type and grade of asphalt to be purchased. The court also found that Lager misunderstood Apex's need to manufacture the asphalt, believing it had the material on hand, and that he also believed Fenton "realized the uncertain[ ]ty of barge availability and that that availability was a contingency for completing the deal." Finally, the court found that Fenton assumed that Lager knew all along that Apex did not stock the asphalt, but had to custom blend it, and that he (Fenton) had also assumed barge availability, "was no problem for Mathy."

With all the evidence before it, the trial court determined that the parties' minds had not met on the essential terms of the agreement. That is the equivalent of a finding that there was no intent to be bound, and it is not clearly erroneous. We agree with the reasoning of the New York Court of Appeals in a similar case, *Kleinschmidt Div. of SCM Corp. v. Futuronics,* 363 N.E.2d 701, 702–03 (N.Y. 1977):

> Under the Uniform Commercial Code, if the parties have intended to contract, and if an appropriate remedy may be fashioned, a contract for sale does not fail for indefiniteness if terms, even

623

important terms, are left open (sec. 2–204, subd. [3]). It is no longer true that dispute over material terms inevitably prevents formation of a binding contract. What is true, and decisive in this case, is that when a dispute over material terms manifests a lack of intention to contract, no contract results.

The basic philosophy of the sales article of the ... Code is simple. Practical business people cannot be expected to govern their actions with reference to nice legal formalisms. Thus, when there is basic agreement, however manifested and whether or not the precise moment of agreement may be determined, failure to articulate that agreement in the precise language of a lawyer, with every difficulty and contingency considered and resolved, will not prevent formation of a contract .... But, of equal importance, if there be no basic agreement, the code will not imply one. In this case, it was found as a fact by the trial court, a finding supportable by the evidence and affirmed by the Appellate Division, that there was no basic agreement.

Without agreement there can be no contract, and, of course, without a contract there can be no breach. This principle, basic as it is to contract law, finds explicit recognition in the ... Code .... The principle should be dispositive of this case. [Citations omitted.]

We believe the same is true here.

*By the Court.*—Judgment affirmed.

SUNDBY, J. (*dissenting*). I have no quarrel with the majority's statement of the applicable contract principles. I believe, however, that the parties entered into a binding contract.

The majority does not attach sufficient significance to the previous dealings between the parties.[1] In June 1986 Kenneth Fenton, representing Apex, telephoned James Lager, representing Mathy Construction, and inquired as to a possible sale by Apex to Mathy of liquid asphalt. On June 13, 1986, in a telephone conversation with Lager, Apex, through Fenton, agreed to sell to Mathy 120–159 pen grade asphalt, subject to credit approval. The parties had the capability of communicating by QWIP Facsimile

[1]The majority opinion correctly notes that under sec. 402.208(1), Stats., a single occasion of conduct does not constitute a "course of performance" which is relevant to determine the meaning of an agreement. Official UCC Comment, sec. 4, W.S.A. sec. 402.208 (1964). I do not suggest reliance on a "course of performance." The crucial question in this case involves a usage of trade—responsibility to nominate a barge—which can be shown without proof of a prior course of dealing. Sec. 401.205, Stats. I suggest reference to the previous contract between the parties simply to show that Mathy intended, according to trade usage, when it agreed to buy Apex's asphalt "F.O.B. Wood River, Illinois" that it would supply and nominate a barge to pick up its order.

In a decision which appears to have been codified in sec. 401.205, Stats., *Scaramelli & Co., Inc. v. Courteen Seed Co.,* 194 Wis. 520, 217 N.W. 298 (1928), the parties had contracted but once previously. Nevertheless, the defendant was allowed to show that it was the general custom to ship seeds by vessel sailing directly from the port of exportation to the port of importation. The court said: "The custom certainly appears to be a reasonable one and does not vary the terms of the written contract, but merely supplements it by incorporating in its matters of general custom well understood by both parties and with reference to which it must be presumed the contract was made." *Id.* at 526, 217 N.W. at 300 (citations omitted). The testimony of Mathy's representative, James Lager, established that it knew that "F.O.B. Wood River, Illinois" required that it provide transportation by barge.

There is no question of admissibility of evidence of this usage because Mathy's representative testified to it.

(FAX), a process of transmitting a document by telephone. Fenton sent a FAX to Lager at Mathy confirming their tentative agreement.

After obtaining credit approval, Fenton sent another FAX to Lager at Mathy stating that Apex agreed to sell and Mathy agreed to buy 30,000 barrels of 120–150 pen grade asphalt F.O.B. Wood River, Illinois. F.O.B. means, of course, "free on board," or "without charge to the buyer for goods placed on board a carrier at the point of shipment." *The Random House Dictionary of the English Language* 742 (2d ed. unabridged 1987). F.O.B. refers to the place where the buyer is going to take possession of the product. The sales agreement which confirmed the FAX sale stated that delivery was to be to the barge "Ingram," Wood River, Illinois. There is no dispute that Mathy contracted for the barge or that it was Mathy's responsibility to arrange for the barge to pick up the second order.

Fenton testified that the parties did not attach any significance to the fact that the contract of June 24, 1986 was memorialized in a written sales agreement which was sent by mail. In fact, Mathy paid for the asphalt before it received the written sales agreement.

Thereafter, on July 14 or 15, 1986, Lager contacted Fenton by telephone about the purchase of additional 120–150 pen grade asphalt. The parties followed the same procedure as before. On July 16, 1986 Fenton sent to Lager a FAX communication confirming their July 16, 1986 sales agreement under which Apex agreed to sell and Mathy agreed to buy 30,000 barrels of 120–150 pen asphalt F.O.B. Wood River, Illinois, for delivery between July 30 and August 4, 1986. This FAX agreement provided, however, that Mathy was to

give Apex seven days notice if the pen grade was to be changed to 85–100 pen. As before, Fenton sent a written sales agreement by ordinary mail to Mathy. Mathy, however, did not return the sales agreement. When Apex did not receive notice that Mathy wished to change the pen grade to 85–100, Apex proceeded to manufacture the 30,000 barrels of 120–150 pen grade asphalt. Fenton testified that Mathy purchased in 30,000 barrel quantities because that was all that the Ingram barges Mathy used could handle.

About July 20 or 21, 1986, Fenton telephoned Lager and inquired as to when Mathy intended to "lift" the asphalt. At that time Lager told Fenton it would be around August 1, 1986. In a later telephone conversation Lager told Fenton that the barge was not going to make it until approximately August 10 or 11. When Fenton did not receive instructions from Lager relative to delivery of the asphalt, he communicated by FAX to Lager on August 5, 1986 as follows: "Please advise of your barge nomination for lifting of your 150 pen grade material out of Wood River, IL. Per our last conversation on 7/31/86, you indicated that you were using Ingrams barge for a lifting of 8/10/–11/86."

In none of these conversations did Lager deny that a contractual relationship existed between Mathy and Apex, nor did he state any intention of changing the pen grade of the asphalt.

Fenton again telephoned Lager on August 7 to get a barge nomination. Again, Lager gave no indication that Mathy would not nominate a barge and pick up the asphalt.

On August 7, 1986 Fenton sent another FAX communication to Lager referring to "our July 16, 1986 Purchase/Sales Agreement" and requesting a

barge nomination. On August 8, Lager sent the following letter to Fenton:

> As I informed you during our telephone conversations of [July] 30 and August 6, the availability of a barge to lift the A.C. 120/150 pen. is still in doubt. Additionally, I informed you we had not yet concluded we would need 120/150, possibly, we would want an 85/100 pen. or a vis. grade material for exchange purposes.
>
> The timing of this anticipated shipment is still contingent on the above options.

The deadline for Mathy to give Apex notice if it desired a change in pen grade had, however, expired June 23, 1986.

On August 15, 1986, Lager, for the first time, told Fenton that they did not have a deal and that the confirmation/written sales agreement was merely a proposal.

Lager testified that with respect to the first sale, he had made arrangements for the barge. He admitted that it was not a condition of sale that Mathy be able to obtain a barge. He testified: "It was a foregone conclusion on my part, at least, no boat, no oil." There is no evidence, however, that Lager's "foregone conclusion" was ever communicated to Apex. Lager testified: "I don't know as if I specifically outlined to Ken [Fenton] verbatim, that we wouldn't take it if we didn't have, but that's—it's just a conclusion you have to draw on this business that you must have transportation to prove product." He also testified: "[I]f I can't provide my own transportation, I obviously can't perform the contract." If Mathy intended to rely on a trade usage, that the buyer did not have to perform if it could not nominate a barge, Mathy was required to

628

show that Apex understood that usage. *Knobel v. J. Bartel Co.,* 176 Wis. 393, 398, 187 N.W. 188, 189–90 (1922).

On these facts, which are undisputed, I conclude that there was a meeting of the minds and a binding contract. Therefore, I respectfully dissent.